**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMIAH MICHAEL PROBODANU, Plaintiff, vs. UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., Defendants. | **Certified Transcript** Case No. 8:18-cv-00888-CJC-KS |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
MOTION TO DISMISS
MONDAY, DECEMBER 10, 2018
1:30 P.M.
LOS ANGELES, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CA 90012-4565
dhinospaan@yahoo.com

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFFS:**

LAW OFFICES OF LARRY R. GLAZER
BY: NICOLETTE GLAZER, ATTORNEY AT LAW
1875 Century Park East
Suite 700
Century City, California 90067
310-407-5353

**FOR THE DEFENDANTS:**

OFFICE OF U.S. IMMIGRATION LITIGATION
BY: VICTOR M. LAWRENCE
Civil Division U.S. Department of Justice
450 5th Street NW
Room 10312
Washington, DC 20044
202-305-8788

U.S. DEPARTMENT OF JUSTICE
BY: STEVEN K. UEJIO
Civil Division - Office of Immigration Litigation
P.O. Box 878 Ben Franklin Station
Washington, DC 20044
202-353-7728

**LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 10, 2018**

**1:30 P.M.**

- - -

THE COURTROOM DEPUTY: Calling Item Number 4, SACV 18-888, *Jeremiah Michael Probodanu vs. U.S. Department of Justice*.

01:30PM

MS. GLAZER: Good morning, Your Honor. Nicolette Glazer, appearing on behalf of all plaintiffs/petitioners.

THE COURT: Hello, Ms. Glazer.

01:30PM MR. LAWRENCE: Good afternoon, Your Honor. Victor Lawrence on behalf of the defendants.

THE COURT: Hello, Mr. Lawrence.

MR. UEJIO: Good morning, Your Honor. Steven Uejio, also appearing on behalf of the defendants.

01:30PM THE COURT: Hello, Mr. Uejio.

I've gone through the papers, and so I guess I have just a couple questions. The briefing did a good job of giving me each party's respective positions.

Since it is the government's motion to dismiss, maybe I could pose my questions to the government counsel first.

01:30PM

MR. LAWRENCE: Okay.

THE COURT: Who wants to -- Mr. Lawrence, you're going to be handling it?

01:31PM MR. LAWRENCE: So to speak, yes, Your Honor.

THE COURT: Okay. The only questions I had for you really deal with the DACA claim by Mr. Probodanu. I -- hopefully I pronounced his name somewhat correctly.

MR. LAWRENCE: Don't know. Never met him.

01:31PM THE COURT: Okay. Is it -- is it "Probodanu"?

MS. GLAZER: I believe so, Your Honor.

THE COURT: Tell me -- I understand your position is that we don't allow an alien to request DACA if they're in immigration detention. I just need to understand. Why is 01:31PM that? Because, obviously, there's a claim that that's arbitrary and capricious, and I need a better understanding of the government's position on that.

MR. LAWRENCE: Sure. This is something that I actually tried to get clarification from my clients on, without 01:31PM getting absolute clarity of why that was their policy. But that is their policy as documented on the website and in various papers.

So the reason why it's not arbitrary and capricious is it's not being applied whimsically that "Oh, because 01:32PM Mr. Probodanu was in detention, we're not going to renew his DACA," but rather it applies to everybody who's in detention.

Now, when you talk about "Well, what's the reason for that? Why should there be a different policy with respect to renewing people for DACA when they're in detention?" -- and 01:32PM I think, you know, again, I don't have full clarity on what the

clients' position on that is, but I could tell you that most of the time when somebody's brought into detention, it's for the purposes of removal.

And ICE has already made the decision that this individual that has a removal order -- in the case of Mr. Probodanu, there were travel papers available for him to go back to Indonesia. He had no legal right to stay in the United States. His DACA had expired. He failed to show up at the -- he was called back for his regular check-in. He failed to show up for that in December of 2017. And two weeks later, he shows up. He had already, again, failed to abide by his supervision order of showing up for DACA. And the government just applied the policy in determining to remove him at the time.

And the policy, again, was, well, if you're in immigration detention, then, you know, no renewals are granted -- or no grants of DACA take place at that time because the government's already made the decision that you're removable from the country.

THE COURT: Please. I'm not trying to argue with you, and I'm not trying to put words in your mouth, but I'm just trying to articulate -- what I believe I'm hearing is you're basically saying, from an administrative standpoint, once they've decided to detain someone, the process has -- is already decided; you're going to be removed and you would have

no finality. And it would be very difficult to administer, I suppose, if you had to deal with further challenges at that point.

MR. LAWRENCE: Well, to some degree, you are putting some words in -- I don't know them to be incorrect, but what I will say is this: You have two different agencies at play. They're both within the Department of Homeland Security. But ICE is the agency that detains individuals and removes them, Immigration and Customs Enforcement. And then they have USCIS, United States Citizenship and Immigration Services, and they're the ones who determine whether to grant DACA.

So at some point, USCIS made a decision and said, "Look. When it comes to how we're going to determine who we can put in the eligible pool for people who may get a grant of DACA, that's not going to include people that ICE has already detained presumably for the purpose of removing them from the country."

Is that helpful, Your Honor.

THE COURT: Yeah, it is. It is.

Most of the other claims, candidly, you're going on standing. And whether a district court has jurisdiction to oversee, adjudicate, resolve disputes concerning the execution of a removal order, I think your position is pretty straightforward and set forth in your position papers. But I want to give you an opportunity to say anything else you want

01:35PM
01:36PM
01:36PM
01:36PM
01:37PM

to say about that.

MR. LAWRENCE: Well, I don't want to be repetitive with what's in the papers. I appreciate Your Honor has read them, but I do want to put in a little context -- it was in our papers, but I just want to beef it out a little bit -- which is the idea that these individuals, these two families, have had an enormous amount of due process since the very beginning that they've been in the United States in the sense that they had their claims of persecution heard, in one family, by an asylum officer before going to an immigration judge, having a full trial on the merits, then having their claims heard by the Board of Immigration Appeals, and then petition for review in the Ninth Circuit Court of Appeals.

So both of those families had been through that process of immigration court, the Board of Immigration Appeals, and the Ninth Circuit, and they've been unlawfully in the -- present in the United States from 2009 and 2011, respectively, when the Ninth Circuit had denied all their appeals. So all this time they've had unlawful presence that's continuing up until the present day.

And when we hear these arguments, well, they need time to file motions to reopen or apply for provisional waivers, this isn't the same as other cases, particularly the one Your Honor heard in *Chhoeun*, when people were being rounded up. The Cambodians were being rounded up and didn't have a

chance to apply for motions because they were being shipped from different detention centers and didn't have the same availability of counsel.

In contrast, these individuals have had -- since 2009 and 2011, respectively, they haven't been detained. Nobody's been detained. At least by the -- by counsel's allegations, there hasn't been any motions to reopen that were filed by these individuals. And to have this Court invoke a extraordinary powers of injunctive relieve to say, "No, Government, you can't detain or remove these individuals because they need time to file for these motions," it's a much different situation than it was in *Chhoeun* when literally their backs were against the wall, and they were about to be deported from the country. There's no imminent threat here, at least that's been shown in the allegations and pleadings.

THE COURT: Whatever happened with Mr. Santosa and Ms. Palar? I think they were supposed to appear before an immigration officer in May of 2018, and I didn't see in the Complaint any allegations whether they appeared as they were ordered to do. I know they didn't show up, I believe, because they thought they were going to get arrested. But whatever happened, if you know?

MR. LAWRENCE: I don't know, Your Honor. I know that the Complaint was filed on May 23rd of this year, 2018, and their date was May 22nd to show up. So if anything adverse

happened, I would have expected it to show up in the Complaint.

01:39PM But on that note, also, I did want to say that, not only have they had since 2009 and 2011 to file motions to reopen the provisional waivers and to show that they've gone through these prerequisite steps that are necessary, they've had all the time since they filed their Complaint in May of 2018. And here we are, seven months later, and there's no allegation or assertion that that's been done.

01:39PM And that's a further reason why the government would respectfully request that the Court dismiss this Complaint in its entirety with prejudice.

THE COURT: Okay.

01:39PM MR. LAWRENCE: So -- but without repeating, I would just say that between the lack of standing, given the fact that there's no allegations of detention and no allegations of removal other than what happened to Mr. Probodanu under different circumstances, given the fact that plaintiffs have not filed their class certification motion, which was due a couple months ago pursuant to Rule 23-3 of this Court, which

01:39PM requires the class actions to be -- to move for certification within 90 days of service of the pleading, that hasn't been done, there's been plenty of time for plaintiffs to avail themselves of all the procedures. They just haven't done it.

01:40PM And when it comes to the failure to state a claim, I think we shared in our papers that everything that the

plaintiffs have said, that there's a -- it's a violation of law, there's actually a regulation in place that says that what the government does is up -- you know, abiding with that regulation, there's no violation within it.

01:40PM An example of that would be the government's entitled to revoke release at any time. There's no need for additional due process procedures. Given the fact that they've already been adjudicated to be removed from the country, government's entitled to pick people up at that point, bring 01:40PM them into detention, and to follow through and execute the removal order.

But, again, this is a different case. There's no imminent threat, or none that's been shown by the plaintiffs, unlike situations in *Chhoeun* where people had been rounded up 01:41PM and they had only a few days to go before they were going to be removed and, all of a sudden, they needed to avail themselves of these procedures.

So I would just like to draw that contrast for the Court because I think the factual situation is quite different. 01:41PM And I think, in this case, there's been plenty of due process, plenty of availability for the plaintiffs to use the procedures available to them. And judging by the allegations in the Complaint, it just hasn't been done.

THE COURT: I appreciate your argument. I'll give 01:41PM you a chance to respond to whatever Ms. Glazer has to say.

MR. LAWRENCE: Thank you, Judge.

THE COURT: Ms. Glazer, I'm going to be very transparent with you. I do have -- a concern that the government raised is, as I understand it, none of your clients filed a motion to reopen for a request for an unlawful presence waiver. As I understand it, none of them are in detention. And how is it they could still have standing to bring all these claims?

MS. GLAZER: Your Honor, if I may address, I have to respectfully disagree with my very esteemed colleague. First, Your Honor, I never represented the individuals, the plaintiffs, in their administrative proceedings. So I have limited knowledge of what has transpired.

I have entered an appearance only for Michael and Tatiana. That was last August when the government filed a -- or served them with a notice of intent to deny the I-130 petition. I intervened and entered an appearance, and that I-130 was approved.

With respect, Your Honor, to the allegation with the first -- my understanding is that motions to reopen were filed with the entire Santosa family. I have seen the decision denying the motion to reopen for Michael. His one was clearly separated, and it was denied and expedited because he was in detention at the time.

I have not seen the actual motion to reopen. What I

can convey to the Court is that I actually requested, prior to May 22nd, an opportunity to appear with the Santosa family for the check-in. The officer granted that request, and I appeared with them in June.

01:43PM And on the June date I was ready and prepared to file a motion to stay -- administrative stay with the ICE office. And the officers specifically stated that they have seen their pending motion to reopen and to wait for the decision and, if necessary, to file the stay in the next check-in date.

01:44PM When counsel filed their motion to dismiss in October and stated that there was no motion to reopen, I tried to ascertain what happened with those motions to reopen. Counsel who represented the family has been kind of dodging my request, so I filed a FOIA. So I do not know what and how it was filed, but when I was with the clients at the June ICE check-in, the officer was looking and said he could see that they have a pending motion to reopen. So I proceeded with that.

01:44PM With respect to the Woy family, prior to this Complaint, I requested a -- the local counsel approval and consent for a joint motion to reopen because the facts were different. So the exception to time and number limitation will not necessarily apply. So that's for the motion to reopen.

01:45PM As to the provisional waivers, Your Honor, each of

the family has actively pursued the steps that are available to them under the provisional waiver. Each of them has a pending -- and in one case approved the I-130, which is a first step.

01:45PM Before the applications are transferred to the National Visa Center, the actual provisional waivers cannot be adjudicated or made. So it is the government's control of when the I-130s will be sent.

And, again, it was only in 2016 that the statewide 01:45PM waiver was extended to individuals with a final order of removal. Previously they were prohibited from seeking it. So it was only in 2016, I believe, the regulation and the 90 days run mid-2016. That's when those individuals -- and each of those individuals have a final order of removal -- could 01:46PM actually avail themselves with that process.

We are waiting for them, for the National Visa Center, to provide us with the numbers. The actual provisional waiver required the National Visa Center number to be included because it is done in conjunction with the actual counsel of 01:46PM processing. So I have to disagree with counsel that there was no active -- each family has availed themselves with each of these steps that is available to them under the specific administrative proceeding.

THE COURT: All right. Let me turn to the DACA 01:46PM renewal request that Mr. Probodanu --

MS. GLAZER: Yes.

THE COURT: Why do you believe it was arbitrary and capricious not to renew it?

MS. GLAZER: Well, Your Honor, if I can bring a little background. First, I don't believe that it is correct, from what I've seen, that Michael did not show for check-in. He showed, from what I could see, for all check-ins. He was never given any notice that he has violation. The 220B, which is the form that each individual was given, that says -- and I list it in the Complaint -- "These are the conditions that you have. And if you violate one, your EAD, the work authorization, is automatically terminated. And then if you have -- if you have violated any condition, then you may be taken in detention."

Michael was never served with any such notice of violation, nor was he given an opportunity to explain. My understanding is that he appeared on the date that he had on his paper, and he was arrested at the time.

Now, procedurally, with the DACA, this was kind of unusual because he got married in June 2017. His DACA was expiring the next month. So the family was trying to work with the attorney that was representing him to put in the paperwork to basically get the immediate relative I-130 and the whole process started.

There were delays. And they received notice that

DACA has been terminated. So he was under the impression that, after September 5, he could not proceed because they read the requirement that, if your DACA is due to expire, you can renew it, but you cannot that if you have -- it expired. So he didn't renew it at the time.

01:48PM

My understanding of the facts is when he showed up on December 5th for his check-in with ICE, he was taken in detention at the time, right there.

He filed the renewal, I-130 and everything, and the motion to reopen. And based on the denial that I've seen, the USCIS -- and, again, like counsel said, ICE was the one who arrested him. They made the decision to revoke without the notice, the 1231 release. USCIS is the only agency that could adjudicate a DACA. So the denial -- like I said, we cannot approve it because we lack jurisdiction since you are in detention.

01:49PM

01:49PM

What we are challenging is the ability of the USCIS to claim a jurisdictional bar as a policy when none exists. I mean, again, I will quibble with the use of "jurisdiction" in the context of DACA since the government's position has been recently that there is no jurisdiction to implement DACA. So jurisdiction is perhaps not. But -- so they never reviewed the context or eligibility for DACA. They deny the claim that they have no jurisdiction.

01:49PM

And our position is that's arbitrary because in the

01:50PM

01:50PM implementing memorandum -- which the Court has found to vest certain rights in the eligible applicant and, also, to set the clear parameter by which a DACA application will be reviewed -- specifically allows individuals with final order of removal to avail themselves of DACA. So final order of removal was specifically listed as not a prohibition or a bar to the grant of DACA. Actually, I have seen, when the DACA was first implemented, people who were granted DACA when they were in detention.

01:51PM So, clearly, the policy is a policy that was implemented for some time and has been involved, really, at whim. So we believe that that is arbitrary. And especially since we believe -- and I disagree with counsel that 1231 in the clear congressional intent allows the government to

01:51PM rearrest people outside of the removal period based on a whim. In fact, 241.4(l) actually states that an individual can have a revocation in the 1231 release upon due cause and a notice to be heard. Government simply is disregarding that, and he's not doing it.

01:51PM And the -- rather than what counsel is claiming in his paper, this is not a case asking this Court to either -- review any of the immigration benefits. Instead, it is a question of process that is completely lacking. And it is being withdrawn when previous process existed. And I will

01:52PM specifically reference what the purpose is of the 1231 case,

the practice of providing individual bag and baggage letters. Government has now taken that particular policy back, and he's not doing it. And that position -- counsel has said they can revoke a 1231 release at any time.

01:52PM In this particular case, in the Santosa family, they were granted prosecutorial discretion in 2012. I'm not talking about stay, I'm talking about prosecutorial discretion. And it was specifically because they were eligible in pursuing provisional waivers.

01:52PM So the issues are a lot more -- let's just say the question of standing here is a standing -- both individual and representative standing on a clear threat of imminent injury. And I filed on Sunday the decision of the Ninth Circuit in the *East Bay Sanctuary* case in which the Court specifically stated 01:53PM that threatened injury and the risk of injury is sufficient to the Article III standing in the context of an immigration case. And I believe that's what we have in this case.

THE COURT: Thank you. Appreciate your arguments.

MS. GLAZER: Any other questions from the Court?

01:53PM THE COURT: No. Thank you.

Mr. Lawrence, I'll give you the last word if you want to respond to all that.

MR. LAWRENCE: First thing I would say is that, with all respect to Ms. Glazer, many of the things that came out 01:53PM during her argument were things that were not in the briefs.

For instance, this idea that a motion to reopen was filed. I've never seen a motion to reopen. It wasn't -- as I said to the Court, there was no allegation of a motion to reopen that had been filed in the Complaint.

01:54PM You know, I anecdotally -- and this isn't in my papers either. I heard that there may have been one, but I asked to see it, and I still have not seen one. So Ms. Glazer indicated that she might have heard somebody say that from looking at the database, I believe. And that's what I anecdotally heard as well. 01:54PM

But, nevertheless, when we're talking about the allegations in the Complaint, whether this Complaint is sufficient for purposes of 12(b)(1), 12(b)(6), there were no allegations that a motion to reopen had been filed. There were no allegations that people had taken all these steps towards a 01:54PM provisional unlawful presence waiver. And as a result of that, that's what -- that's why this Complaint is deficient from a 12(b)(1) standpoint with respect to standing.

THE COURT: Let me ask you this question, though. Let's just assume, for purposes of my questions, I agree with 01:54PM you that the Complaint's not adequate. You had indicated earlier that I need to dismiss with prejudice. In light of some of the representations, the statements that are being made, why shouldn't I give leave to amend?

01:55PM MR. LAWRENCE: Which is certainly this Court's

prerogative to do. But I think that, obviously, the time to amend, as a matter of right, has passed. The plaintiffs did see our motion to dismiss and pointed out all these damning deficiencies. They had an opportunity to amend their Complaint, then, to show all these facts that Ms. Glazer brought to court today, and they didn't do so.

01:55PM

And they've had additional time to, perhaps, file declarations to -- rather than just in-court testimony from Ms. Glazer, but declarations to show that these things had been done. And so all the Court would be relying on, with all due respect, is what Ms. Glazer just said today as opposed to anything in the briefing papers or anything in the Complaint. And for those reasons, I think Rule 15(b) or (a) says that when the Court gives -- is free to give leave to amend a Complaint when justice requires.

01:55PM

01:56PM

And I don't think justice requires it in this case when there's been more than ample opportunity -- since this Complaint was filed in May, seven months later, no allegations have changed in the Complaint, no amended Complaint. They've had the ability to amend as a matter of right, and that hasn't been done. And in fairness to the government, I think it would be perfectly acceptable for this Court under those factual circumstances to dismiss the Complaint with prejudice.

01:56PM

THE COURT: All right. Well, I appreciate the argument on both sides. Let me take it under submission and

01:56PM

I'll try to get a decision out either by the end of today or tomorrow.

MR. LAWRENCE: Thank you. And I just want to address one other thing.

01:57PM THE COURT: Okay.

MR. LAWRENCE: Potentially two.

With respect to the denial of DACA for Mr. Probodanu being in immigration detention, Ms. Glazer said it had something to do with lacking jurisdiction. I'm not sure that 01:57PM there's been any factual statement about that either in the Complaint or in the briefing. But as we pointed out, it's pursuant to their policy. And they have a policy, and they have questions and answers on the website which specifically says that they do not grant DACA for individuals who are in ICE 01:57PM detention.

So there's nothing -- the policy -- that's the general policy. There's nothing arbitrary and capricious as applied to Mr. Probodanu. It's just that's the policy in effect. And ICE was -- excuse me -- USCIS was following that 01:58PM policy when it denied the renewal.

It also was -- and after throwing a little bit of shade on Ms. Glazer for establishing facts that are not in the record, I would say that we do understand because -- this is in response to Your Honor's question about what happened with 01:58PM Mr. Probodanu. But we do understand he missed his initial date

01:58PM
to come in, as he was supposed to do, on December 5th, 2017, and then came back 11, 12 days later. And that's when ICE detained him, not originally. But, again, I don't want to rely on that. It's on the record. But I just want to mention that.

01:58PM THE COURT: Okay.

MR. LAWRENCE: I think I'll stop there. But I appreciate Your Honor's time on this. And, again, we would respectfully request dismissal with prejudice.

THE COURT: All right. Thank you.

01:58PM I will, like I said, try to get a decision out either by the end of today or tomorrow.

MR. LAWRENCE: Thank you, Your Honor.

THE COURT: Thank you.

THE COURTROOM DEPUTY: All rise.

01:59PM This court is adjourned.

**(Proceedings concluded at 1:59 p.m.)**

**--oOo--**

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES )
)
STATE OF CALIFORNIA )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date: October 30, 2019*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*